SCHERN RICHARDSON FINTER, PLC
Aaron M. Finter #022437
Michael Robert Somers #017501
1640 S. Stapley Drive, Suite 132
Mesa, Arizona 85204
Email: courtdocs@srflawfirm.com
Tel: (480) 632-1929
*Attorneys for Plaintiffs*

UNITED STATES DISTRIC COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Carolina M. Lopez, an unmarried woman, and Charles Kirkland, an unmarried man,<br><br>Plaintiffs,<br><br>v.<br><br>State Bankshares, Inc., a North Dakota corporation; Bell Bank, a North Dakota corporation; James M. Dufrense and Jillian L. Dufresne, husband and wife; and Benjamin Allen and Caroline Allen, husband and wife,<br><br>Defendants. | No. CV-25-02808-PHX-SHD<br><br><br>**THIRD AMENDED COMPLAINT** |

Plaintiffs Carolina M. Lopez ("Carolina") and Charles Kirkland ("Charles")(collectively "Plaintiffs"), allege against Bell Bank ("Bell Bank"), James M. Dufresne ("Dufresne"), Jillian L. Dufresne ("Mrs. Dufresne"), Ben Allen ("Allen"), and Jane Doe Allen[1] ("Mrs. Allen")(Bell Bank, Dufresne, Mrs. Dufresne, Allen, and Mrs. Allen are collectively referred to herein as "Bell Defendants"), and State Bankshares, Inc. ("Bankshares") as follows:

---

[1] Mrs. Allen is fictitiously named in this Complaint pending learning her true identity, if Ben Allen is in fact married.

**PARTIES**

1.      Plaintiff Carolina M. Lopez is an unmarried woman domiciled in Maricopa County, Arizona.

2.      Charles Kirkland is an unmarried man who was, at all times relevant hereto, domiciled in Maricopa County, Arizona.

3.      Carolina and Charles were formerly married.

4.      Bell Bank is a North Dakota state bank, whose principal address is 3100 13th Ave. S., Fargo, ND 58103.  Bell Bank is registered to do business in Arizona.

5.      James M. Dufresne is a Senior Vice President and Senior Wealth Management Advisor for Bell Bank and a resident of Maricopa County, Arizona.

6.      Jillian L. Dufresne is, upon information and belief, the wife of James Dufresne and a resident of Maricopa County, Arizona.

7.      Ben Allen is an employee of Bell Bank and a resident of Maricopa County, Arizona.

8.      Jane Doe Allen is, upon information and belief, the wife of Ben Allen and a resident of Maricopa County, Arizona.

9.      State Bankshares, Inc. is a North Dakota corporation who offered securities in Maricopa County, Arizona, and is believed to be the parent company of Bell Bank.

**JURISDICTION AND VENUE**

10.      This Court has jurisdiction and venue is proper pursuant to 28 U.S.C. §§ 82, 1331, 1367, 1441(a) and 1446.

## **GENERAL ALLEGATIONS**

11.    On January 24, 2023, Carolina and Charles entered into an Executive Line of Credit, Loan No. 59000245 (the "LOC") with Bell Bank, a copy of which is attached hereto as Exhibit A.

12.    The LOC had a credit limit of $20,000,000, against which Plaintiffs had borrowed $15,044,411.12.

13.    As collateral for the LOC, Plaintiffs pledged the cash and securities contained in their Bell Bank Wealth Management Account No. *****3017 ("Securities Account").

14.    The maturity date of the LOC was January 24, 2024 ("Maturity Date").

15.    The regular payments under the LOC were equal to the accrued monthly interest ("Regular Payments"), with the principal balance due as a balloon payment.

16.    Regular Payments were to be automatically deducted from Plaintiffs' savings account, Account No. *****0661 ("Savings Account").

17.    During the term of the LOC, Plaintiffs made all of their required Regular Payments.

18.    On February 3, 2023, without any event of default having occurred, Bell Bank advised that it was accelerating the indebtedness and advised it was going to sell the property in the Securities Account to collect the balance due on the LOC.

19.    Dufresne was the representative of Bell Bank who contacted Charles to declare that the indebtedness was being accelerated.

20.    Bell Bank declared the default in bad faith, there having been no monetary default or non-monetary default on the LOC.

21.     On February 3, 2023, without conceding the propriety of Bell Banks' actions, Charles gave specific instructions to Dufresne at Bell Bank as to which securities to sell to minimize the impact on the Securities Account portfolio and tax consequences.

22.     The understanding between Charles and Dufresne was that Dufresne was not going to sell any securities at a loss, and specifically that Dufresne was going to sell the bonds, which were all in a profit position at that time.

23.     Upon information and belief, Dufresne worked with Allen to carry out the liquidation of the securities in the Security Account.

24.     Neither Dufresne nor Allen followed Charles's instructions with regard to which securities to sell.

25.     "As part of their certification, a CFP® professional commits to CFP Board to act as a fiduciary—which means to act in the best interests of the client at all times when providing financial advice and financial planning."

26.     Dufresne is allegedly certified as a Certified Financial Planning professional.

27.     On his LinkedIn page, Dufresne stated, "I follow a financial planning-based process to understand each client's unique situation and customize recommendations to fit their needs and risk capacity. I've aligned myself with Bell Bank because they follow a philosophy, which is based on academic research and empirical evidence that clearly show investment outcomes are primarily driven by managing risk and expenses, not the pursuit of products promising excess performance.

"Bell Bank Wealth Management was designed with the intention of addressing the very investing challenges clients are facing today. We deliver a pure advisory experience with recommendations that are free of conflict. We leverage state of the art systems designed to focus on risk, taxes, and expenses, and deliver better outcomes."

28.    Allen is allegedly a Certified Exit Planning Advisor.

29.    As a Certified Exit Planning Advisor, Allen assumed a role of trust and confidence, and thus a fiduciary obligation to act in the best interests of Plaintiffs at all times when providing financial advice and financial planning.

30.    Bell Bank advertises its wealth management services, including investments, financial planning, trusts and estates, and retirement plans.

31.    On its website, under "Bell Investments", Bell Bank stated, "We get to know you, your goals and your dreams, and together we plan for your future. We have your best interest in mind, always."

32.    On its website, under "Financial Planning", Bell Bank stated, "We'll help you consider financial goals, time horizon and risk tolerance – and deliver guidance in your best interest."

33.    On its website, under "Find a Financial Advisor", Bell Bank stated, "When you choose Bell as your fiduciary advisor, you provide a legacy that protects your family and beneficiaries. Meet with an advisor who can help you with all your banking needs."

34.    Defendants Dufresne and Allen acted as investment advisors to Plaintiffs, including soliciting investments into various funds and investment products.

35.     Bell Bank held itself out as a fiduciary, offering investment and wealth management services.

36.     According to the North American Securities Administrators Association, an investment adviser gives advice about securities and other investment products and provides ongoing management of investments based upon clients' objectives.  Bell Bank and its employees were investment advisers.

37.     According to the North American Securities Administrators Association, an investment adviser may also be referred to as an investment manager, wealth manager, or portfolio manager.

38.     According to statements furnished to Plaintiffs, Defendant Dufresne was labeled an "Advisor" and Matthew Pierce was labeled a "Portfolio Mgr".

39.     According to the North American Securities Administrators Association, "Investment advisers have a fiduciary responsibility to put clients' interests ahead of their own when providing investment advice."

40.     Upon information and belief, Dufresne has a personal investment in Bell Bank, and thus had a conflict of interest in advising Plaintiffs when it comes to the selling of their securities to repay an allegedly defaulted loan.

41.     Dufresne acted to maximize the profits of Bell Bank at the expense of his clients, who relied upon him to uphold his fiduciary responsibilities and act in their best interest.

42.     Dufresne and Allen were not mere order takers for securities transactions, they recommended investment products to Plaintiffs, helped them manage their wealth, and provided financial planning.

43.     On February 3, 2023, the Securities Account had in excess of $1,000,000 in cash and cash equivalents available, which Charles authorized Bell Bank to use to satisfy the indebtedness.

44.     Upon information and belief, on February 3, 2023, Bell Bank, through Dufresne and Allen, indiscriminately sold approximately $15,328,976.86 worth of securities from the Securities Account, disregarding the instructions from Charles.

45.     Bell Bank failed to apply the balance of the cash and cash equivalents to the indebtedness first, and thus sold over $1,000,000 more in securities than was necessary to satisfy the indebtedness.

46.     Bell Bank failed to sell certain bonds that Charles instructed Bell Bank to sell, which bonds were in a profit position but have since decreased in value.

47.     Upon information and belief, Bell Bank failed to sell securities that Charles instructed Bell Bank to sell (those in a positive position relative to their acquisition cost), which securities have since gone down in value.

48.     Upon information and belief, securities that Bell Bank sold that should not have been sold have since increased in value.

49.     Upon information and belief, Plaintiffs will suffer negative tax effects due to Bell Bank's failure to follow Charles's instructions regarding which securities should be sold.

50.    Upon information and belief, the losses suffered by Plaintiffs due to Bell Bank's disregard of Charles's instructions total an amount in excess of $400,000, likely over $617,000.

51.    Shortly after the securities were liquidated, Bell Bank closed Plaintiffs' LOC account.

52.    Bell Bank falsely stated that the account was closed due to a lien or garnishment or attachment, but when asked to provide proof of such actions, Bell Bank failed to produce such proof.

53.    Bell Bank next stated that the account was closed due to a significant change in Plaintiffs' financial condition.

54.    The only significant change in Plaintiffs' financial condition that had occurred at that time was Bell Bank's unilateral decision to liquidate over $15,000,000 in securities assets to satisfy the indebtedness under the LOC.

55.    Upon information and belief, as employees of Bell Bank acting within the scope of their employment, Dufresne and Allen were in control of Plaintiffs' accounts and were responsible for directing the liquidation of the Securities Account and the closing of the LOC account.

## PREFERRED STOCK IN STATE BANKSHARES, INC.

56.    On November 29, 2022, Mr. Dufresne had Plaintiffs sign a Conflict of Interest Waiver, in order to permit Bell Bank to sell its own parent's securities to Plaintiffs.

57.    The Conflict of Interest Waiver required the Plaintiffs to acknowledge they have made their own independent decision as to whether the purchase of the Preferred Stock is appropriate for their investment portfolio and current financial situation, indicating that Bell Bank

and Mr. Dufresne failed to provide proper investment advice in violation of Arizona Administrative Code R14-6-207(A), which is deemed a "fraudulent practice within the meaning of A.R.S. § 44-3241(A)(4)".

58.    The waivers in the Conflict Waiver violate Arizona Administrative Code R14-6-203(19), which declares a "Dishonest and unethical practice" includes "Requesting or requiring any person to waive compliance with any provision of the IM Act or the rules thereunder. Any such waiver shall be void."

59.    The State Bankshares, Inc. Securities Subscription Agreement for 5% Non-Cumulative Perpetual Convertible Preferred Stock ("Subscription Agreement"; the securities issues pursuant thereto are referred to as the "Preferred Stock") was dated December 5, 2022, when it was executed by Plaintiffs and Bell Bank.

60.    The Preferred Stock was not registered with the U.S. Securities and Exchange Commission ("SEC"), and a Form D claiming an exemption from registration was filed on December 16, 2022.

61.    The Subscription Agreement contained terms that were contrary to the representations made by Mr. Dufresne to Plaintiffs regarding the duration of the investment and whether dividends were to be paid.

62.    After the Preferred Stock was purchased, Bell Bank continued to represent to Charles that he could redeem the shares early, which was contrary to the terms of the Subscription Agreement: "He may ask us to early redeem, but, we can't force that upon him."

63.     It was not prudent for Mr. Dufresne to recommend the Preferred Stock investment to Plaintiffs given their desire for higher returns on their capital and preference for liquidity.

64.     Upon information and belief, based upon Bell Bank's representations, Bell Bank has authority to act for Bankshares with regard to matters involving the Preferred Stock, including processing assignments of stock and payments of dividends.

65.     The Certificate Evidencing Non-Cumulative Perpetual Convertible Preferred Stock of State Bankshares, Inc., representing Plaintiffs' 1,000 shares (the "Preferred Stock Certificate"), states the securities are "transferable on the books and records of the Company, in person or by a duly authorized attorney, upon surrender of this certificate duly endorsed and in proper form for transfer," yet Bell Bank has refused to allow Plaintiffs to transfer Charles's interest in the Preferred Stock to Carolina, pursuant to a divorce decree ordering the transfer.

66.     On February 17, 2025, Plaintiffs' counsel sent an Assignment of Stock, on a form prescribed by Bell Bank, to Bell Bank's counsel, to transfer Charles's interest in the Preferred Stock to Carolina.

67.     On February 17, 2025, Bell Bank's counsel, Scott Jenkins, advised that pursuant to Section 8(c) of the Subscription Agreement, Bell Bank was not providing consent to assignment of the Preferred Stock.

68.     Section 8(c) of the Subscription Agreement governs assignment of the Subscription Agreement itself and not of the underlying securities, which are in fact assignable without Bell Bank's consent, pursuant to the Preferred Stock Certificate.

69.    Bell Bank failed to acknowledge Plaintiffs' assignment of the Preferred Stock in order to falsely claim that the stock was still half-owned by Charles, so that Bell Bank could direct funds owed to Carolina to the IRS.

70.    Bell Bank coordinated its efforts with the IRS to allow the IRS to issue new levies, in an attempt to attach Charles' assets held by Bell Bank.

71.    Bell Bank complied with the new levies in bad faith, claiming that Charles had a 50% interest in the payments owed to Carolina, ignoring the order to transfer the stock contained in the divorce decree, and ignoring the fully executed assignment document that Bell Bank refused to process.

72.    As of March 27, 2025, Bell Bank continued to refuse to acknowledge the lawful transfer of the Preferred Stock from Charles to Carolina.

73.    Neither Bankshares nor Bell Bank provided a full accounting of the payments made to Plaintiffs under the Preferred Stock investment prior to the filing of the Complaint in this action.

74.    Bell Bank has acknowledged that certain checks allegedly sent to Plaintiffs have not been cashed (e.g., Check Nos. 4878 and 5669), thus Bankshares has failed to make those payments, in breach of the terms of the Preferred Stock.

75.    On January 17, 2024, Mr. Dufresne discussed re-issuing checks to Plaintiffs with Jodi Johnson, but such checks were never re-issued.

76.    Counsel for Bell Bank claimed in bad faith that simply mailing the checks to Plaintiffs constitutes full performance of the Bankshares obligation to make such payments.

77.    Bell Bank engaged in protracted stalling tactics to prevent Plaintiffs from receiving their money before Bell Bank could direct the funds to the IRS, pursuant to newly issued IRS levies.

78.    Upon information and belief, Bell Bank paid funds owed to Carolina to the IRS pursuant to levies that Bell Bank conspired to create, in order to attach the older payments then owed exclusively to Carolina.

79.    Bell Bank and Bankshares failed to timely produce copies of the summons received from the IRS dated August 7, 2024, and failed to provide a copy of their response to that summons dated September 17, 2024 to Plaintiffs, despite this ongoing litigation and Defendants' obligation to produce evidence pursuant to Rules 26 and 26.1, Arizona Rules of Civil Procedure.

80.    The Defendants knew or should have known that the IRS had no legal basis for requesting information about Carolina, yet the Defendants provided that information without so much as informing Carolina about the subpoena.

81.    Bell Bank and Bankshares withheld information from Plaintiffs, in bad faith, in order to assist the IRS with confiscating Carolina's money.

82.    Bell Bank's, and thus Bankshares's, conduct was intended to cause harm to Plaintiffs, especially to Carolina.

83.    Plaintiffs have been damaged in an amount exceeding $1 million.

**BEACON PARTNERS FUND II, LP INVESTMENT**

84.    On or about September 27, 2022, Bell Bank had Charles and Carolina sign a "Letter of Direction", causing Plaintiffs to invest $200,000 in a limited partnership offering from Beacon Partners Fund II, LP ("Beacon Fund").

85.    The Letter of Direction required the Plaintiffs to "represent, warrant and agree" as follows:  "I acknowledge and agree that Bell Bank has not provided me with tax, legal or investment advice with respect to the LP interests or their purchase in my Investment Management Agency account at Bell Bank," which is evidence that Bell Bank and Mr. Dufresne failed to provide proper investment advice in violation of Arizona Administrative Code R14-6-207(A), which is deemed a "fraudulent practice within the meaning of A.R.S. § 44-3241(A)(4)".

86.    The waivers in the Conflict Waiver and Letter of Direction violate Arizona Administrative Code R14-6-203(19), which declares a "Dishonest and unethical practice" includes "Requesting or requiring any person to waive compliance with any provision of the IM Act or the rules thereunder. Any such waiver shall be void."

87.    On September 27, 2022, Plaintiffs signed the Subscription Agreement of Beacon Partners Fund II, LP, via DocuSign.

88.    Plaintiffs did not have a signed copy of the 108-page Beacon Partners Fund II Limited Partnership Agreement until it was produced in discovery in this litigation.

89.    On November 17, 2022, Bell Bank had Charles and Carolina sign another Letter of Direction that included investments in the Preferred Stock and the Beacon Fund.

90.    Plaintiffs' investment in Beacon Fund later increased to $1 million.

91.     Before making their investment, Plaintiffs were only given an "Investment Summary" as a disclosure document.

92.     Plaintiffs received payments from Beacon Fund, but neither Bell Bank nor Beacon Fund provided any proof of such payments prior to the filing of the Complaint in this action.

93.     On March 26, 2025, Carolina was finally able to get information about the status of the investment, the investment's performance, and the value of the Beacon Fund investment.

94.     According to Beacon Fund's documents, Plaintiffs received distributions totaling $14,268.66 in 2023, a return of 1.427% on the $1 million investment.

95.     The last record provided for 2024 shows one distribution February 16, 2024 of $3,745.96, putting the investment on a similar pace for returns in 2024.

96.     From inception of the investment to the end of the period ending December 31, 2023, Plaintiffs' capital account balance was $974,064, the result of $14,269 in distributions, $70,561 in unrealized appreciation, and $82,228 in net investment losses.

97.     Bell Bank and Mr. Dufresne breached their fiduciary duties in recommending the Beacon Fund investment.

98.     Bell Bank and Dufresne failed to make adequate disclosures of the risks associated with the Beacon Fund investment, the prospects for reasonable returns, the time horizon for the investment, and why the investment fit with the goals of Plaintiffs.

## COUNT ONE – BREACH OF CONTRACT
### (Bell Bank)

99.     Plaintiffs incorporate by reference and reallege every paragraph of this Complaint.

100.    The LOC, as amended, was a contract between Bell Bank and Plaintiffs.

101. Implied in every contract is a covenant of good faith and fair dealing.

102. Bell Bank declared Plaintiffs to be in default of the LOC immediately after entering into the LOC, depriving Plaintiffs of the benefit of their bargain.

103. Bell Bank misrepresented the reasons for declaring Plaintiffs to be in default so that Bell Bank could justify undoing its transaction and recovering funds loaned to Plaintiffs.

104. Pursuant to 26 U.S.C.A. § 6323, Bell Bank would have held a superior security interest in the collateral as against a federal tax lien that might arise against Plaintiffs.

105. Bell Bank's reaction to news that tax liens may be filed in the future by the federal government was a bad faith declaration of default based upon an insecurity that could not exist.

106. In carrying out the liquidation of the Securities Account, Bell Bank breached its obligation to act in good faith and deal fairly with Plaintiffs when it failed to follow Charles' instructions as to how to carry out such liquidation.

107. Bell Bank breached the covenant of good faith and fair dealing by selling more of Plaintiffs' property than required to satisfy the indebtedness, leaving approximately $935,433.38 in cash and equivalents after selling approximately $15,328,976.86 worth of securities from the Securities Account.

108. In carrying out the liquidation, Bell Bank sold securities at a loss, sold securities that should not have been sold, and failed to sell securities that should have been sold, contrary to the exercise of sound business judgment and contrary to the instructions from Charles.

109. Plaintiffs were harmed by the actions of Bell Bank to the extent the securities that should not have been sold would have increased in value.

110.    Plaintiffs were harmed by the actions of Bell Bank to the extent that Plaintiffs will suffer adverse income tax consequences that were avoidable had Bell Bank followed Charles' instructions.

111.    Plaintiffs are entitled to damages in an amount to be proven at trial.

112.    Plaintiffs should be awarded their attorneys' fees and costs pursuant to A.R.S. §§ 12-341 and 12-341.01.

## COUNT TWO – BREACH OF FIDUCIARY DUTIES
### (Bell Bank, Dufresne, and Allen)

113.    Plaintiffs incorporate by reference and reallege every paragraph of this Complaint.

114.    Bell Bank accepted custody and control over Plaintiffs' assets, especially those in the Securities Account, after entering into the LOC and its security agreement.

115.    Bell Bank and its wealth advisors provided investment advice and financial planning to Plaintiffs, and thus held themselves out as fiduciaries.

116.    Bell Bank, Dufresne, and Allen were placed in a position of trust and confidence with respect to the valuable assets in the Securities Account.

117.    Upon entering into the LOC, Bell Bank owed a fiduciary duty to Plaintiffs to act with a high degree of care, honestly, fairly and in good faith, and to not engage in self-dealing or act in its own self-interest with respect to the assets in the Securities Account that were pledged as collateral for the LOC indebtedness.

118.    Dufresne and Allen, acting as agents for Bell Bank, and acting as financial advisors to Plaintiffs, assumed fiduciary duties with respect to how they dealt with Plaintiffs' Securities Account at all times.

119.   Bell Bank is vicariously liable for the actions of its employees, Dufresne and Allen.

120.   Bell Bank and Dufresne did not act fairly and in good faith when they prematurely declared Plaintiffs to be in default of the LOC.

121.   Bell Bank, Dufresne, and Allen did not act fairly and in good faith when they failed to follow Charles's instructions with regard to how to liquidate the securities in the Securities account.

122.   By not following Charles's instructions, Bell Bank, Dufresne, and Allen caused Plaintiffs to suffer harm from the method in which the Securities Account was liquidated.

123.   Bell Bank, Dufresne, and Allen abused any discretion they were given to manage the Securities Account and control its liquidation to satisfy the indebtedness.

124.   Plaintiffs were harmed as a result of Bell Bank's, Dufresne's, and Allen's breaches of fiduciary duties in an amount to be proven at trial.

125.   Bell Bank, Dufresne, and Allen acted with an evil mind, and in bad faith, knowingly causing harm to Plaintiffs in order to serve their own self-interests, entitling Plaintiffs to an award of punitive damages.

### COUNT THREE – NEGLIGENCE
**(Bell Bank, Dufresne, and Allen)**

126.   Plaintiffs incorporate by reference and reallege every paragraph of this Complaint.

127.   By assuming control over the Securities Account, Bell Bank, Dufresne, and Allen assumed a duty to act with reasonable care to not cause harm to Plaintiffs.

128.   By assuming their fiduciary responsibilities, Defendants owed Plaintiffs a duty of care that goes beyond the contractual arrangements between Bell Bank and Plaintiffs.

129.    Bell Bank is vicariously liable for the actions of its employees, Dufresne and Allen.

130.    Bell Bank, Dufresne, and Allen breached the duty owed to Plaintiffs when they disregarded Charles's instructions with regard to how to liquidate the Securities Account.

131.    Reasonable care should at a minimum be evaluated with reference to the instructions provided by Charles, a co-owner of the Securities Account.

132.    Plaintiffs would not have suffered damages from the liquidation of the Securities Account but for the actions of Bell Bank, Dufresne, and Allen.

133.    Plaintiffs suffered damages in an amount to be proven at trial due to the indiscriminate way in which the Securities Account was hastily liquidated.

## COUNT FOUR – TORTIOUS BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (Bell Bank)

134.    Plaintiffs incorporate by reference and reallege every paragraph of this Complaint.

135.    "[I]n special contractual relationships, when one party intentionally breaches the implied covenant of good faith and fair dealing, and when contract remedies serve only to encourage such conduct, it is appropriate to permit the damaged party to maintain an action in tort and to recover tort damages." *Rawlings v. Apodaca*, 151 Ariz. 149, 160, 726 P.2d 565, 576 (1986).

136.    In this case, Bell Bank is claiming to have absolute discretion over Plaintiffs' funds in their accounts and the collateral, such that it may ignore its fiduciary obligations to Plaintiffs when acting as their creditor.

137.    Bell Bank intentionally breached the covenant of good faith and fair dealing when it declared a default under the LOC in bad faith, then ignored its fiduciary obligations when it liquidated the collateral for the bank's own selfish benefit.

138.    Bell Bank, through its employees, continued to hold fiduciary obligations to Plaintiffs with regard to Bell Bank's wealth management and advisory services even after an alleged breach of unrelated loan agreements.

139.    There was not in fact any breach of loan documents, Bell Bank declared the LOC to be in default in bad faith, based upon an irrational fear that its security interest in the collateral could be challenged by the federal government asserting tax liens or recovering in restitution.

140.    Bell Bank disregarded information provided by Plaintiffs regarding the harms they could suffer if Bell Bank did not sell certain securities and instead sold others.

141.    Bell Bank intentionally violated the covenant of good faith and fair dealing when it unnecessarily sold over $1 million in securities despite having that amount of cash already available to satisfy Plaintiffs' debts.

142.    Plaintiffs are entitled to tort damages for Bell Bank's intentional breach of the covenant of good faith and fair dealing.

143.    Bell Bank acted with an evil mind and selfish motives, in disregard of its special relationship with Plaintiffs, which merits an award of punitive damages in an amount to be determined by a jury.

### COUNT FIVE – BAD FAITH BREACH OF CONTRACT, PREFERRED STOCK
### (State Bankshares, Inc.)

144.    Plaintiffs incorporate by reference and reallege every paragraph of this Complaint.

145.    Bankshares had a special, fiduciary relationship to Plaintiffs as holders of equity investments in Bankshares.

146.    Bankshares, acting through its agent, Bell Bank, failed to pay amounts owed to Carolina as dividends from the Preferred Stock.

147.    Acting in concert with the Internal Revenue Service, Bankshares prevented the transfer of Charles's interest in the Preferred Stock to Carolina, so that outstanding payments due would be paid to the IRS under new levies.

148.    Bankshares acted in bad faith, intending to harm Carolina by improperly directing her payments to the IRS.

149.    Bankshares failed to re-issue payments that it knew had not been paid to Carolina before the IRS levies, conspiring with the IRS to make those payments subject to new IRS levies against Charles.

150.    Bankshares and Bell Bank intentionally provided information about Carolina to the IRS without giving Carolina notice of the summons from the IRS, in furtherance of the plot to direct Carolina's funds to the IRS.

151.    Bell Bank disregarded its obligations to produce material evidence in this litigation, in furtherance of its plot to deprive Carolina of the Preferred Stock payments.

152.    Defendants' actions were intentional, malicious, and done with an intent to harm Carolina, including prejudicing her ability to maintain her claims in this litigation, such that punitive damages are warranted.

153.    Pursuant to Bankshares's breaches, Plaintiffs are entitled to damages in an amount to be proven at trial.

## COUNT SIX – BREACH OF FIDUCIARY DUTIES – PREFERRED STOCK AND BEACON FUND SECURITIES
### (Dufresne, Bell Bank, and Bankshares)

154.    Plaintiffs incorporate by reference and reallege every paragraph of this Complaint.

155.    Mr. Dufresne recommended that Plaintiffs purchase the Preferred Stock without full disclosure of the true terms of the Preferred Stock.

156.    Even after the Preferred Stock was purchased, Mr. Dufresne led Charles to believe that the stock was redeemable at his option, contrary to the express terms of the Subscription Agreement.

157.    Mr. Dufresne duped Plaintiffs into investing $1 million in Preferred Stock paying only 5% interest dividends, which dividends were payable *at the option* of Bankshares.

158.    The Preferred Stock investment was not consistent with Plaintiffs' desire for higher returns and liquidity in their investments.

159.    Making Plaintiffs owners of Bankshares put them in a direct conflict of interest with Bankshares, as borrowers from Bell Bank under the Wealth Management Account, which relationship also required Bell Bank to act as Plaintiffs' fiduciaries.

160.    Plaintiffs are entitled to rescind the stock purchase, such that Carolina should receive $1 million plus any accrued dividends in return for surrendering the Preferred Stock to Bankshares, which shares are hereby tendered.

161.   When Plaintiffs sought to transfer Charles's interest in the Preferred Stock to Carolina, Bell Bank refused to process the Assignment Agreement, despite it being the exact form requested by Bell Bank.

162.   Bell Bank had fiduciary obligations to Plaintiffs when acting for Bankshares with respect to the Preferred Stock.

163.   Bell Bank intentionally delayed the transfer of the Preferred Stock to Carolina in order to allow the IRS to issue new liens against Charles, so that half the money owed to Carolina would instead by paid to the IRS.

164.   Plaintiffs have suffered damages in an amount to be proven at trial.

165.   Bell Bank, Bankshares, and Mr. Dufresne acted in bad faith and with intent to harm Carolina, such that punitive damages are warranted.

166.   Mr. Dufresne breached his fiduciary duties to Plaintiffs when he recommended the purchase of the Beacon Fund investment.

167.   The Beacon Fund investment was not consistent with Plaintiffs' desire for higher returns and liquidity in their investments.

168.   Plaintiffs were given minimal, pie-in-the-sky disclosure documents regarding the potential returns and risks of the Beacon Fund investment.

169.   Plaintiffs originally intended to put $200,000 into the Beacon Fund, but Mr. Dufresne convinced them to put another $800,000 into the investment.

170.   Beacon Fund has produced information about the investment and Plaintiffs' returns, showing that Plaintiffs' investment is producing pitiful returns and was losing value.

171.    Mr. Dufresne, and his employer, Bell Bank, acted in bad faith, motivated by self-interest, and have caused Plaintiffs to suffer damages from the Beacon Fund investment in an amount to be proven at trial.

## COUNT SEVEN – DECLARATORY RELIEF

172.    Plaintiffs incorporate by reference and reallege every paragraph of this Complaint.

173.    On February 17, 2025, Plaintiffs' counsel sent an Assignment of Stock, on a form prescribed by Bell Bank, to Bell Bank's counsel, to transfer Charles's interest in the Preferred Stock to Carolina.

174.    Bankshares, through Bell Bank's counsel, refused to acknowledge the change in ownership from Charles to Carolina.

175.    There exists a controversy over the date of transfer of true ownership of the Preferred Stock, which caused Bell Bank to send funds owed to Carolina to the IRS in bad faith and under false pretenses.

176.    Carolina is entitled to a judgment establishing that she was the true owner of 100 percent of the Preferred Stock, as of February 17, 2025 at the latest.

177.    Earlier requests from Carolina and Charles to transfer the Preferred Stock to Carolina were ignored by Bell Bank.

178.    Subject to proof, Bell Bank should be required to acknowledge the transfer of Charles' interest in the Preferred Stock as of the earliest date such request was made to Bell Bank.

## COUNT EIGHT – VIOLATION OF A.R.S. § 44-3241, FRAUD IN THE PROVISION OF INVESTMENT ADVISORY SERVICES
### (Dufresne, Allen, Bell Bank)

179.    Plaintiffs incorporate by reference and reallege every paragraph of this Complaint.

180.    The Bell Defendants violated A.R.S. § 44-3241 by requiring Plaintiffs to sign waivers acknowledging that they would not hold the Bell Defendants liable for not providing the investment advice required by Arizona Administrative Code R14-6-207, in violation of R14-6-203.

181.    Plaintiffs were duped into purchasing the Preferred Stock as a direct result of the Bell Defendants' failures to properly consider Plaintiffs' financial situation and investment objectives, which would have led to the conclusion that the investment was not suitable for Plaintiffs.

182.    The Bell Defendants misrepresented the nature of the Preferred Stock, leading Plaintiffs to believe that the investment was liquid despite the terms of the Subscription Agreement.

183.    The Preferred Stock investment was especially ill-advised because the Preferred Stock was security for the Plaintiffs' LOC, and Bell Bank has taken the position that the investment could not be liquidated for a number of years.

184.    Plaintiffs were duped into investing $1 million in the Beacon Fund investment as a direct result of the Bell Defendants' failures to properly consider Plaintiffs' financial situation and investment objectives, which would have led to the conclusion that the investment was not suitable for Plaintiffs.

185.    The Beacon Fund investment was especially ill-advised because the membership interests were security for the Plaintiffs' LOC, and the investment could not be liquidated for at least six months after it was purchased.

186.    The Beacon Fund investment also required a long time to mature because the Beacon Fund was a startup operation that did not generate any near-term returns, preventing that $1 million from generating funds needed to pay interest on the LOC.

187.    The Bell Defendants are liable for all losses incurred by Plaintiffs as a result of the violation, together with interest on losses incurred, court costs and reasonable attorneys' fees. A.R.S. § 44-3241(B).

188.    Plaintiffs have suffered losses due to below-market returns being earned on their $2 million.

189.    Plaintiffs suffered losses because the ill-advised investments caused Bell Bank to liquidate an extra $2 million in securities when it improperly called the LOC due in February of 2023.

190.    Carolina lost additional funds when Bell Bank failed to transfer control of the Preferred Stock to her when requested, resulting in Bell Bank directing payments owed to Carolina to the IRS, pursuant to a levy Bell Bank waited to have issued.

191.    Had Bell Bank not recommended the purchase of the Preferred Stock, Bell Bank would not have later been able to manipulate the stock ownership to Carolina's detriment.

192.    The Beacon Fund investment continues to incur losses while also providing very little cash flow.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendants as follows:

A.    For judgment in their favor on all claims in this Third Amended Complaint;

B.    For an award of compensatory and punitive damages in an amount to be determined at trial;

C.    For an award of attorneys' fees and costs pursuant A.R.S. §§ 44-3241, 12-341 and 12-341.01;

D.    For a declaratory judgment that Carolina became the owner of 100 percent of the Preferred Stock no later than February 17, 2025;

E.    For such further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 13th day of November, 2025.

SCHERN RICHARDSON FINTER, PLC


By: /s/   Rob Somers
Aaron M. Finter
Michael Robert Somers
1640 S. Stapley Dr., Ste. 132
Mesa, AZ 85204
*Attorneys for Plaintiffs*

I hereby certify that on November 13, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all registered participants.


/s/ Ronnie Taxin